UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ x
DONNA ANN GABRIELLE CHECHELE,  :
                                       :
               Plaintiff,        :
                                       :
     - against -            :               11 Civ. 0146 (PAC)
                                       :
JOHN G. SPERLING and PETER V.  :             OPINION & ORDER
SPERLING,                       :
                                       :
             Defendants,    :
     - and -                :
                                       :
APOLLO GROUP, INC.,            :
                                       :
            Nominal Defendant.  :
------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>March 29, 2012</u>

HONORABLE PAUL A. CROTTY, United States District Judge:

      Plaintiff Donna Ann Gabriele Chechele ("Chechele"), brings this shareholder derivative action on behalf of nominal defendant Apollo Group, Inc. ("Apollo"), against John G. Sperling and Peter V. Sperling (collectively, "Defendants") pursuant Section 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b) ("Section 16(b)").  Chechele seeks disgorgement of alleged short-swing profits realized by Defendants in connection with five prepaid forward sale agreements for Apollo stock.  Chechele also alleges that Defendants violated Section 16(a) of the Exchange Act by failing or refusing to file reports to disclose their sale of Apollo stock during the six months after they purchased those securities.  On June 6, 2011, Defendants moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons discussed below, Defendants' motion to dismiss is granted.

## BACKGROUND

The facts alleged in this case are not in dispute.  John G. Sperling ("JGS") serves as Executive Chairman of the Board of Directors of Apollo.  His son, Peter V. Sperling ("PVS"), is the Vice Chairman of Apollo's Board of Directors.  Between January 2006 and July 2007, Defendants each entered into separate prepaid forward sale agreements ("PFSAs")[1] with unaffiliated third party buyers for shares of Apollo Class A common stock.  On April 24, 2006 and July 11, 2007, JGS executed PFSAs with an unaffiliated third party buyer in which JGS agreed to sell a total of up to 1,500,000 shares of Apollo Class A common stock for future delivery.  (Compl. ¶¶ 11-12.)  On January 19 and April 24, 2006, and on July 11, 2007, PVS also executed separate PFSAs with a third party buyer for a total of up to 1,815,000 of Apollo Class A common shares for future delivery.  (Id. ¶¶ 19-20.)

As part of each transaction, the third party agreed to pay an up-front fixed aggregate price for future delivery of the shares on a predetermined settlement date.  (Declaration of John G. Sperling ("JGS Decl."), Ex. A3; Declaration of Peter V. Sperling ("PVS Decl."), Ex. A3.)  Although JGS and PVS pledged as security the maximum number of shares covered by the PFSAs, the contracts provided that the exact number of shares sold would be determined on the settlement date based on financial formulas that were linked to the stock's market price on the settlement date.  (Compl. ¶¶ 12-13, 20-21.)  If the market price of Apollo stock on the settlement date dipped below a fixed floor price, the PFSAs would require Defendants to deliver the maximum number of specified shares.  If the stock price exceeded a fixed ceiling price, however,

---

[1] A prepaid forward sale agreement has been defined in another context as "a contract entered into by an insider with a counterparty under which the insider contracts to sell a fixed number of shares of stock of the insider's company on a fixed future date (usually at least a year in the future) at a fixed price (typically the market price on the date of entering into the contract)." Donoghue v. Centillium Commc'ns. Inc., No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *1 (S.D.N.Y. Mar. 28, 2006) (citing Peter J. Romeo & Alan L. Dye, Section 16 § 10.05[3][a] at 942-43 (2d ed.)).

or leveled off between the floor price and the ceiling price, the formulas in the PFSAs would determine the exact number of pledged shares that Defendants would be required to transfer. Under the PFSAs, Defendants also retained the option of making a cash payment equal to the value of the Apollo shares owed on the settlement date, provided that they notified the third party prior to the settlement date.

On January 9, 2009 and April 24, 2009, JGS' forward sale agreements settled for below the pledge amount, and JGS recovered the remaining 211,700 and 63,500 shares, respectively, that JGS had initially pledged pursuant to the PFSAs. (Compl. ¶ 15.) When PVS's forward sale agreements settled on January 9 and 20, 2009, and April 24, 2009, the settlement price also fell below the pledge amount, and the remaining shares of Apollo stock were returned to him (in share amounts of 788,300; 254,606; and 436,500, respectively). (Id. ¶ 22.)

In January 2009, shortly after the PFSA settlement dates, Defendants each sold shares of Apollo stock on the open market. (Id. ¶¶ 18, 26.) In each of these open market transactions, the Apollo share price was higher than the previous settlement price under the PFSAs. (Id.) Plaintiff alleges that the return of the remaining Apollo shares on the PFSA settlement dates constitute "purchases" for purposes of Section 16(b), and that Defendants realized short-swing profits when they subsequently sold Apollo shares on the open market. (Id. ¶¶ 31, 37.)

## DISCUSSION

A.  Standard of Review

In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). A court need not accept as true, however, "[l]egal conclusions, deductions or opinions couched as factual allegations." In

3

re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1960

(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007)). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  In

determining the sufficiency of a complaint, the Court may consider "the factual allegations in

[the] . . . complaint, . . . documents attached to the complaint as an exhibit or incorporated in it

by reference, . . . matters of which judicial notice may be taken, [and] documents either in

plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit."

Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993).

    B.  Section 16(b)

    Section 16(b)[2] seeks to deter corporate "insiders," who are presumed to possess material

information about an issuer, from using inside information as a basis for trading in the issuer's

---

[2] Section 16(b) of the Securities Exchange Act of 1934 reads in full:

> For the purpose of preventing the unfair use of information which may have been obtained by
> such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit
> realized by him from any purchase and sale, or any sale and purchase, of any equity security of
> such issuer (other than an exempted security) or a security-based swap agreement (as defined in
> section 206B of the Gramm-Leach-Bliley Act) involving any such equity security within any
> period of less than six months, unless such security or security-based swap agreement was
> acquired in good faith in connection with a debt previously contracted, shall inure to and be
> recoverable by the issuer, irrespective of any intention on the part of such beneficial owner,
> director, or officer in entering into such transaction of holding the security or security-based swap
> agreement purchased or of not repurchasing the security or security-based swap agreement sold
> for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity
> in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in
> the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty
> days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be
> brought more than two years after the date such profit was realized. This subsection shall not be
> construed to cover any transaction where such beneficial owner was not such both at the time of
> the purchase and sale, or the sale and purchase, of the security or security-based swap agreement
> (as defined in section 206B of the Gramm-Leach-Bliley Act) involved, or any transaction or
> transactions which the Commission by rules and regulations may exempt as not comprehended

securities "at an advantage over persons with whom they trade." <u>Gwozdzinsky v. Zell/Chilmark Fund, L.P.</u>, 156 F.3d 305, 308 (2d Cir. 1998).  The statute imposes a general rule of strict liability on "beneficial owners" of more than ten percent of a corporation's listed stock, as well as the issuer's officers and directors, for any profits realized from a "short swing" purchase and sale, or sale and purchase, of such stock occurring within a six-month period.  15 U.S.C. § 78p(a)(1), (b).  These statutorily defined "insiders" are liable to the issuer of the stock for their short-swing profits, and are subject to suit "instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer . . . ."  <u>Id.</u>; <u>Gollust v. Mendell</u>, 501 U.S. 115, 117 (1991).

For liability to attach under Section 16(b), a plaintiff must prove that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period.  <u>Gwozdzinsky</u>, 156 F.3d at 308.  Liability may attach under Section 16(b) "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information."  <u>Roth v. Jennings</u>, 489 F.3d 499, 507 (2d Cir. 2007) (quoting <u>Kern County Land Co. v. Occidental Petroleum Corp.</u>, 411 U.S. 582, 595 (1973)).

C.   "Purchase" of Stock

It is undisputed that Defendants were officers of Apollo and are therefore statutory "insiders" for purposes of Section 16(b).  The issue in this case is whether retention of shares upon the settlement of each PFSA constituted a purchase of stock that would trigger liability under Section 16(b).  Defendants argue that since the portion of shares they retained under the

within the purpose of this subsection.

15 U.S.C. § 78p(b).

PFSAs was automatic and "resulted solely from the mechanics of the fixed formulae," as specified at the time the PFSAs were executed, there was no way for Defendants to manipulate the PFSA settlement, and no subsequent "repurchase" occurred.  (Def's Mem. at 3.)  Thus, without an opportunity to misuse inside information at the time of the PFSA settlements in order to gain speculative advantage, Defendants contend that they should not be held liable under Section 16(b).  (Id.)  Plaintiff argues that the Securities and Exchange Commission ("SEC") views the settlement of shares under a PFSA as a "purchase" under Section 16(b), and that the repurchased shares should be matched with the Defendants' subsequent sales of Apollo stock to create short-swing liability under Section 16(b).  (Pl's Mem. at 4.)

The 1991 amendments to the SEC rules clarify that Section 16(b) applies to derivative securities, which are defined as including "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege related to an equity security."  17 C.F.R. § 240.16a-1(c); see also SEC Release No. 34-28869, 56 Fed. Reg. 7242, 7248-49 (Feb. 8, 1991).  For purposes of Section 16(b), "holding derivative securities is functionally equivalent to holding the underlying equity securities, since the value of the derivative securities is a function of or related to the value of the underlying equity security."  SEC Release No. 34-28869, 56 Fed. Reg. at 7248.  As a result, the sale or purchase of a fixed option occurs when the option agreement is executed and not when it is actually exercised.  17 C.F.R. § 240.16b-6(a).  By contrast, where a financial instrument has a floating price, it is not included within the definition of a "derivative security" under Rule 16a-1(c).  Donoghue v. Centillium Commc'ns Inc., No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *5 (S.D.N.Y. Mar. 28, 2006); 17 C.F.R. § 240.16a-1(c)(6) (excluding  from definition of derivative security "rights with an exercise or conversion privilege at a price that is not fixed").

In Donoghue, the court found that an insider defendant's transfer of shares pursuant to a variable prepaid forward agreement for stock did not trigger disgorgement liability under Section 16(b).  Pursuant to the variable prepaid forward, defendant, a director of Centillium, deposited 300,000 shares of Centillium stock into a trust account for a third party, and received an up-front payment for the shares based on the closing price.  2006 WL 775122, at * 1.  The agreement specified a settlement date on which the shares would be transferred to the third party.  Id.  If the stock price fell below a predetermined "floor" price on the settlement date, the defendant was obligated to deliver all 300,000 shares to the third party.  Id. at *2.  If the stock price exceeded the floor price on the settlement date, however, the defendant could retain the number of shares equivalent to the amount by which the value of the 300,000 shares exceeded the floor price.  Id. at *1.  As in this case, the defendant also had the option to pay the third party the fair market value of any shares owed on the settlement date.  Id. at *2.

On the settlement date, Centillium's stock price fell below the floor price, and defendant delivered the 300,000 shares to the third party.  Id.  Approximately six weeks later, defendant purchased additional shares of Centillium stock on the open market in an unrelated transaction. Id.  Plaintiff alleged that defendant recognized a short-swing profit from the "sale" of stock on the settlement date and his subsequent purchase of Centillium shares.  Id.  Defendant contended that the settlement of the variable forward agreement was not considered a "sale" for purposes of Section 16(b).  Id.

The court began its analysis with the presumption that "[w]hen a transaction does not fall within the literal terms of Section 16(b), the statute must be interpreted in a way that is consistent with its legislative purpose."  Id. at *5 (citing Steel Partners II, L.P. v. Bell Indus., Inc., 315 F.3d 120, 124 (2d Cir. 2002)).  Accordingly, whether the forward agreement triggered Section 16(b)

7

liability depended on "'whether the transaction may serve as a vehicle for the evil which Congress sought to prevent – the realization of short-swing profits based upon access to inside information.'"  Id. (quoting Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 594 (1973)).  The court concluded that the forward agreement did not present the risk for abuse of insider information because defendant was obligated to settle the transaction on a predetermined date, "regardless of whether the stock price was favorable to him on that date." Id. at *5.  Moreover, the number of shares to be transferred on the settlement date "was dictated by financial formulae and criteria set forth in the [Forward agreement]," which the defendant could not change.  Id. (internal quotation and citation omitted).  Since the defendant "was powerless to manipulate the settlement of the Forward to his advantage," defendant's transfer of shares under the agreement was not a "sale" under Section 16(b).  Id.

The same reasoning applies here.  Under the PFSAs, the number of shares to be sold on the settlement date depended upon formulas which were set two to three years earlier, when the Sperlings entered into the agreements.  There is no suggestion that the Sperlings subsequently modified these formulas.  The Sperlings had no opportunity to speculate on the basis of their inside information at the time of the settlements in 2009.  See Donoghue, 2006 WL 775122, at *5 ("Defendant could only have exploited inside information at the inception of the Forward . . . .").[3]  Since the Sperlings' rights "became fixed and irrevocable" at the time they entered into the PFSAs, see id., the repurchases of the Defendants' retained shares on the settlement date did not

---

[3] Plaintiff argues that Donoghue is inapposite because the prepaid variable forward agreement in that case "settled well below its floor price . . . so the insider did not receive any shares back at settlement."  (Pl's Mem. at 17.) Plaintiff's distinction fails, however.  In both cases, whether the insider sold or repurchased shares on the settlement date was determined based on formulas specified in the agreements which the defendants entered into years earlier. Neither scenario presents any risk of speculation on the basis of inside information.  Cf. Allaire Corp. v. Okumus, 433 F.3d 248, 252-52 (2d Cir. 2006) ("[T]he exercise of a fixed-price call option is a non-event for 16(b) purposes because the insider by then is already bound by the terms of the option, [so] the potential for abuse of inside information is minimal.") (citation omitted).

constitute a "purchase" under Section 16(b). Accordingly, Defendants are not liable under

Section 16(b) for disgorgement of their alleged short-swing profits.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint pursuant to Fed.

R. Civ. P. 12(b)(6) is granted. The Clerk is directed to enter judgment and terminate this case.

Dated: New York, New York
　　　　March 29, 2012

　　　　　　　　　　　　　SO ORDERED

　　　　　　　　　　　　　PAUL A. CROTTY
　　　　　　　　　　　　　United States District Judge

9